WILLIAM PANTON, Appellant, *v.* ERASTUS TEFFT, Appellee.

APPEAL FROM KANE.

The word "also," in a deed, expressing what is granted thereby, means likewise, in like manner, in addition to, denoting that something is added to what precedes it.

Parol evidence cannot be admitted to explain an ambiguity, which is patent.

A sworn answer must be disproved by two witnesses.

THE complainant, Erastus Tefft, filed his bill in which it is set forth:

That on the 10th day of December, 1847, Joseph Tefft and Benjamin W. Raymond, (who were seized in fee simple of about forty acres of land, situate at Clinton, in Kane county, on the west bank of Fox river, extending several rods above and below the dam, and also of the west half of the dam and water power thereby created), entered into an agreement with one G. M. Woodbury, to convey to him a part of said land, and 1,200 inches of the said water power, to be drawn from a race to be constructed; the same to be the first privilege of said water power, on condition that he should erect a stone flouring mill on said land, repair and raise the west half of said dam, make a bulk-head flume, etc., and construct a race from the dam to the south line of said land.

That said Woodbury commenced work upon said mill, and having made considerable progress, afterwards, on the 9th day of April, 1849, he concluded an agreement with one Hiram J. Brown, by which he agreed to deed to said Brown as soon as he should obtain a deed from Tefft and Raymond, the piece of ground on which said mill now stands, and one-third of said 1,200 inches of water, and said Brown agreed to fulfill the covenants on the part of said Woodbury, in the said agreement between him and Tefft and Raymond.

That said Brown thereupon entered upon the performance of said work.

That afterwards, on the 5th day of February, A. D. 1853, the said Tefft and Raymond (still having the title in fee to said forty acres of land, and the west half of said dam and water power) for a valuable consideration, conveyed to complainant the said forty acres of land and the west half of said dam and water power, by warranty deed.

That shortly after the purchase of said property by complainant, he erected on the opposite side of the street, and about 66 feet below the flouring mill built by said Brown, a large and expensive paper mill, the machinery of which is propelled by the water power created by said dam, and drawn from the race, extending a few rods further south. That since the completion of said paper mill the complainant has carried on and is desirous in future to carry on the business of paper making therein.

That in constructing and putting said paper mill in operation, complainant has expended about $1,500.00, and in carrying it on is obliged to employ from ten to fourteen men and expend about $50 per day, and if deprived of the necessary water to propel said mill, he would suffer great injury in his said business.

That with the dam in repair and tight, a proper bulk-head, the race in repair and tight, and no waste at said flouring mill, at all seasons of the year there would be 600 inches of water for the use of the flouring mill, and all and more water for use of paper mill than needed, of the west half of the water power created by said dam.

That in December, A. D. 1854, complainant obtained from said Woodbury a release of all his interest to the property, etc., mentioned in the said agreement.

That on the 1st day of April, 1854, said Brown had completed the said flouring mill on said premises more particularly described in deed from complainant to said Brown. Had dug and fitted, so as to be used, though not made tight, the race from the dam to the south end of the flouring mill, and repaired to some extent the west half of dam and bulk-head, and put three run of stone in said mill, and three re-acting wheels to drive the same.

That said mill covered the entire ground which Brown was to have by the agreement with Woodbury, and owing to the manner in which the mill was constructed, it would be an advantage to Brown to allow him to carry or conduct the water from the race (which came from the north along the west wall of the mill) across a small piece or part of complainant's land, lying next to the north-west corner of said flouring mill, on to the water-wheels of said mill.

That the amount of water which Brown was to obtain by his contract with Woodbury, was found insufficient for the successful operation of said mill with said wheels. That Brown applied to complainant to execute to him a deed of said ground and 400 inches of water, and at same time solicited complainant to allow him 200 inches more of water, and privilege of conducting it across complainant's land adjoining mill at north-west corner.

It was mutually agreed between complainant and Brown that said Brown should permit complainant, whenever he desired it, to remove the stones at north-west and north-east corners of said mill and erect another building adjoining, so that north wall of mill should be a partition wall, and that complainant should deed to said Brown the ground on which mill stands, and 600 inches of water of said water power, and grant him the privilege of conducting the same across the corner of complainant's lot, in manner before stated; and that the first and exclusive water privilege should be the amount necessary for the paper mill, and the said 600 inches for the flouring mill—and that the said mills should stand equal in drawing their respective amounts as above stated—and that said Brown should keep in repair the west half of dam and the race leading therefrom, to

south side of flouring mill. And in case of fracture in either race or dam, Brown was to repair the same as soon as practicable on request. And that the title to the said 600 inches of water, ground, and the privilege of drawing the water aforesaid, should be subject to the faithful performance of the agreement to keep the said dam and race in repair; and for that purpose said Brown might take stone from complainant's quarry. That having agreed, they called upon S. Wilcox to prepare the necessary papers and explain their agreement to him, and he drew a deed conveying the ground on which said mill stands, and 600 inches of water, (and only 600 inches, as complainant and said Brown then understood it.) And also granting the privilege of drawing the water across complainant's land, as aforesaid; which said deed was executed and acknowledged by complainant and his wife, and delivered to said Brown.

That said Brown, upon the delivery of said deed, sold and assigned to complainant, all his interest in said agreement, and to the land and property therein mentioned.

That said Brown, after the 18th day of April, 1854, has had no title or interest in the ground on which said mill stands, or in the water power on the west side of said river, or any privilege except what he acquired by virtue of last named deed; and the only consideration for which was the erection of said mill, and making the repairs, etc., before stated.

That said Brown owned and occupied the said mill until about the 1st day of June, 1854. That said Brown never pretended or claimed, during that time, any right to more than 600 inches of water.

That on or about said 1st day of June, 1854, Brown sold and conveyed the said flouring mill and the 600 inches of water, and the rights and privileges contained in deed from complainant to Brown, to William Panton, the defendant. That Panton, before and at the time of purchase, understood the grants in his deed from Brown to be identical with those contained in deed from Tefft, the complainant, to Brown, and that neither deed conveyed more than 600 inches of water.

That defendant has run the mill since his purchase—that the three water wheels used in said mill with full head, will pass from 12 to 1,800 inches of water, and that defendant now uses, during ordinary business hours, more than 600 inches of water. That during low water there is not enough water left to propel the paper mill, and thereby occasions him great damage. That with dam and race out of repair, there would have been enough left still for said paper mill, if defendant had only used the 600 inches.

That complainant requested defendant not to use more than the 600 inches, but defendant still continues to use more than said amount, and claims that he has a right by the terms of said deed to use sufficient for propelling his mill.

That defendant may be required to answer the premises and allegations in the bill contained under oath.

Prayer for injunction restraining defendant from using or drawing more than 600 inches of water, and that only on an equality with complainant, for a decree that the deeds may be corrected so as to express and conform to the true intent and meaning of the parties as before stated. And that defendant may be decreed to perform the covenants on his part, as contained in said deed, and upon failure so to do, that said deeds may be declared void, and said property, privileges, etc., may be declared forfeited to complainant, and for other and further relief, etc.

The deed filed with the bill, so far as grants are concerned, is set out in the opinion.

Panton, under oath, filed his answer, and says he has no knowledge of the contracts, rights or interests of the said Tefft and Raymond, G. M. Woodbury, Hiram J. Brown, as set forth in the bill, previous to the time he purchased the said mill property of the said Brown, except what he obtained from the records of Kane county, and from the deed given by said complainant to said Brown, dated 17th day of April, 1854, save as stated by his answer.

Avers that some time and during the first year after this defendant went into possession of said mill, and since the said complainant began to interfere with and deprive this defendant of the rights and privileges in the premises purchased by him of said Brown, defendant has heard various statements in reference to what was understood by others to be the agreements between persons having or claiming to have interests in said premises previous to defendant's purchase of the same, in substance as follows : That some seven years ago, said Woodbury entered into some sort of a contract with said Tefft and Raymond to build a flouring mill on west side of river at Clinton, with four run of stone, and keep the west half of the dam and race in repair, for which said Tefft and Raymond were to deed him certain lots upon which to erect said mill, etc., and also 1,200 inches water for the use of the same — and that said Woodbury made a similar contract with Truman Gilbert, on east side of the river, and erected a mill with four run of stone on said east side, in 1850.

That said Woodbury made a contract with one Hiram J. Brown, to build said mill on west side of river, according to his

agreement with said Tefft and Raymond, except in one particular, viz.: that said Brown was to keep in repair one-half of the west half of said dam and race.

That said Brown, in the year 1850, erected said mill with four run of stone.

That owing to some misunderstanding between the said Tefft and Raymond and said Woodbury, he, Woodbury, did not obtain from them a deed to said premises, but they conveyed their interest in the premises to the complainant, subject to whatever rights Woodbury might have in the same. That said Woodbury subsequently sold out his property, and left the country.

That after said Brown had got his mill into operation, and having no title to the same, (the legal title being in complainant,) he called upon complainant to deed to him what property belonged to him.

That complainant and said Brown differed as to Brown's rights in the premises, and had several conversations on the subject. That said Brown caused a deed to be drawn of said property, giving to said mill the first privilege of water power, as he then understood his rights; but complainant refused to give him such a deed, and finally caused the deed to be made which is described in bill of complaint.

Answer admits that defendant purchased the mill property, together with certain privileges and water power, as described in deed from said Brown. That at the time defendant purchased the same there were four run of stone and three water wheels in said mill. That complainant had a paper mill, located as described in his bill, with three water wheels.

Answer denies all knowledge previous to his purchase of said premises as aforesaid, in relation to the understandings and negotiations between the complainant and said Brown, or of the claims or acts of said Brown as alleged in said bill, or his or their respective rights in the premises; and denies that he was informed by Brown, complainant or any other person, that the deed from complainant and wife to Brown, and the deed from Brown to this defendant, conveyed only those alleged in the bill to have been conveyed; and denies that he was informed, or believed that the quantity of water intended or supposed to be granted in each of said deeds was only six hundred inches; but says that previous to and at the time of his purchase, as aforesaid, he was a miller by occupation, and resided at Aurora, in said county, and being desirous of leasing or buying a mill, and hearing that said mill could be bought, called upon Brown for that purpose, and most all the conversation he had with Brown at that time was in reference to the price and time of

payment for said premises; and desiring to ascertain whether Brown's title to the same was good, and knowing that he derived it from complainant, thought he could obtain from him all necessary information. He therefore called upon complainant, informed him of his intention to purchase said mill, and his object in calling upon complainant. Complainant then informed defendant that he had a warranty deed of said premises from Tefft and Raymond, of the whole village property and water power, and had given a good deed to said Brown of the mill property. Has no recollection of any other conversation at that time, and having received complainant's answer as above stated, defendant closed his contract of purchase with said Brown.

Answer absolutely denies that before his purchase and some time after he went into possession, he had any knowledge or information that complainant claimed that the rights of the parties in said premises were different from those expressed in said deeds; and that in negotiating for and purchasing said property, he was governed and informed wholly and entirely as to the rights and privileges he should acquire by the grants contained in complainant's deed to said Brown, and heard nothing from any source whatever, conflicting with what the defendant supposed to be the true construction of the language contained in said deed.

Answer denies that defendant has failed to keep and faithfully perform all the conditions and obligations incumbent upon him in relation to keeping said dam and race in repair, and that he has carefully repaired said dam and race at all practicable seasons of the year when the same required it. That said dam and race are now and have been since this defendant took possession of the same, in as good repair as they can be with such material. That defendant has not only kept the same in as good repair as when complainant deeded the same to said Brown, but has expended over $400 in making them better and more secure than when he bought the same, and also about $100 upon an embankment along the road, all of which defendant insists is no part of his obligations in the premises; but has expended said money and intends to expend much more to make said dam and race more secure than when he bought, thereby necessarily benefiting the complainant.

Answer admits defendant took possession, and continued therein as stated in complainant's bill, and uses the same wheels and machinery that were in said mill at the time of complainant's sale; and defendant therefore uses the same quantity of water when in operation, as was used by said Brown, and no more.

Answer denies that complainant remonstrated against his using more than six hundred inches of water, but on the contrary thereof says, that soon after he went into possession of said mill, complainant, whenever desirous of repairing or arranging his said mill, would shut off the water at the head of the race and thereby stop defendant's mill, without regard to the injury thereby caused defendant, preventing his reaping profit in operating the same, and also from grinding grain for those who came to his mill for that purpose.

That during the first four or five months, complainant thus stopped defendant's mill in all about one month; and when remonstrated with by defendant, replied he would let the water into the race when he got ready.

That some time about the first of last August, the complainant informed this defendant that he had obtained a copy of the deed from Brown to this defendant, and that it gave him (the defendant) the privilege of drawing water at south end of his flouring mill, and notified the defendant that he should close up the opening at the north end, and take the water at the south end, according to the terms of said deed; and that he would compel defendant to do so, though such change would be no benefit to complainant, and would cost this defendant $2,000.

That as to the other grant of six hundred inches in said deed, did not understand nor was he informed anything in regard to it, and the only construction he could then have given is the same he should now. That the first grant of water was intended to run the mill as it then was, and the six hundred inches was intended to propel such other wheels as might be necessary to operate the stone in the mill for which there was then no wheel.

That defendant then understood as now, that the first privilege of said water power was the quantity required to propel complainant's paper mill and defendant's flouring mill, as it was at the date of complainant's deed to said Brown, and not the six hundred inches for said grist mill. And that the said two mills stood on an equality as to the drawing and using their respective quantities of water as they then were at the date of said Brown's deed, and not that said paper mill, with its additional machinery and wheels, has an equal right with said grist mill, which uses now precisely the same quantity of water that it did at the date of said Brown's deed, and then each mill had three water wheels.

At June term, A. D. 1858, cause was heard before ISAAC G. WILSON, Judge. Decree declared that the quantity of water granted in the deed from complainant and wife to Hiram J. Brown, and in the deed from said Brown and wife to defendant, is only six hundred inches, and that the other clause only grants

the right or privilege of carrying the said six hundred inches over complainant's land to defendant's mill.

Injunction made perpetual, and one dollar damages, and costs of suit, decreed against defendant. To which decree defendant, by his counsel, excepted. Appeal allowed.

Appellant assigns for error that the Circuit Court erred in admitting in evidence the depositions of Hiram J. Brown and John M. Smith; in admitting improper evidence for the complainant; and in rendering the decree aforesaid.

W. B. PLATO, and B. C. COOK, for Appellant.

S. WILCOX, for Appellee.

WALKER, J. The decision of this case depends upon the construction to be given to the deeds from appellee to Hiram J. Brown, and from him to appellant. Both conveyances describe the grant in the same language, and the portion which produces this controversy is as follows: "In consideration of the covenants on the part of said Brown hereinafter contained, and of one dollar to them in hand paid by the said party of the second part, the receipt whereof is hereby acknowledged, and the said party of the second part forever released and discharged therefrom, have granted, bargained, sold, remised, released, aliened and confirmed, and by these presents do grant, bargain, sell, remise, release, alien and confirm, unto the said party of the second part and to his heirs and assigns forever, all the following described lot, piece or parcel of land situate in the county of Kane, and State of Illinois, and known and described as follows, to wit: A strip fifty feet in width off of the south side of Lot No. Eight (8), in Block No. Seventeen (17), of Clinton Town Plat, as laid out by Tefft and Raymond, being the grounds on which said Brown's flouring mill stands, and being fifty feet on the race and running east to the river; also the privilege of drawing water at the north end of said mill for the use of said mill as it now is; also the said party of the first part grants, bargains and sells unto the party of the second part, his heirs or assigns forever, six hundred inches of water to be drawn from the dam across Fox river at Clinton, on the west side, for said mill. The first privilege of the water shall belong to said Tefft's paper mill and said flouring mill, and between them the privilege to be equal; also the privilege of quarrying and removing stone from said Tefft's quarry in said town of Clinton, sufficient for all repairs, and for keeping up said dam and race, that may hereafter become necessary. This conveyance is made upon this express condition, and the title to the property and priv-

ilege aforesaid shall ever remain subject to the faithful fulfillment of them, to wit: The said Brown, his heirs and assigns, shall henceforth and forever maintain and keep in repair the west half of said dam and race leading therefrom to the south side of said flouring mill, and in case of a breach or fracture in the said dam or race, the said Brown, his heirs or assigns, covenant and agree to and with the said Tefft, his heirs and assigns, to repair the same as soon as practicable after being requested, and that said Brown will allow said Tefft at any time hereafter to erect a building adjoining on the north said flouring mill, and to take out the corner stones at the north-east and north-west corners of said mill, and join the walls of said building thereto so as to make the north wall of said mill the partition wall between the mill and the building so erected. All of which conditions said Brown, his heirs and assigns, hereby covenant and agree to and with said Tefft, his heirs and assigns, to keep, observe and perform."

It is insisted that this deed only conveys the right to Brown and his heirs and assigns, to use six hundred inches of water. The first clause in the grant in terms, conveys to the grantor the land upon which the mill then stood. The next clause, which is introduced with the word " also," the privilege of drawing water at the north end of the mill, for its use as it now is ; and then follows the third clause, which in like manner commences with the word " also," and grants in terms six hundred inches of water, to be drawn from the dam across Fox river, on the west side, for said mill. Were it not that each of these clauses are introduced with the word " also," there might be some question, as to the construction which should be given to the language employed in this grant. But that word in its proper sense means " likewise, in like manner," in addition to, and its popular meaning, agrees perfectly with the definition given by lexicographers. It means some other thing, in the same, or like manner. Then when the grant was made of the property, the privilege of drawing water at the north end of the mill for its use as it was then situated, was in like manner granted ; and by the third clause six hundred inches of water to be drawn from the dam on the west side, for the mill, was in like manner granted. If these two clauses had been designed as the same, why specify that one was to be drawn at the north end of the mill, and the other from the dam on the west side ? Why describe one as a privilege of drawing water for the mill as it then was, and the other as six hundred inches ? We do not see by what rule of interpretation these two clauses can be construed as meaning the same thing, or the latter as qualifying, restricting or explaining the first. The word also is

never employed to confine or limit what has been already said, but is used to denote that something else is added to what precedes it. If the latter clause had been designed to limit the privilege of drawing water at the north end of the mill, to only six hundred inches, it seems to us, that very different language would have been employed by the parties. It seems clear that the second granting clause if it had stood alone in the deed would have given the right to use all the water necessary to run it with the machinery then employed, and that the third granting clause does not limit or restrict that privilege, to any other or different amount, but on the contrary grants six hundred additional inches, to be taken from another place, and for additional machinery, or for other purposes in the mill.

We do not perceive how the parol evidence could vary the rights of the parties in this contest. Even if it establishes a mistake, in the grant from appellee to Brown, the defendant by his answer denies all knowledge of any mistake before, or at the time of his purchase, and this answer is sworn to, and must be overcome by the evidence of at least two witnesses, or its equivalent, to entitle complainant to relief. Such proof was not adduced on the trial in this case. Smith in his first deposition states, that at the time the deed was executed, Brown informed appellant that he only sold him six hundred inches of water, but in his second deposition he states that he did not intend to so state the fact, but that the conversation was in reference to the place from which the six hundred inches of water should be taken, whether from the dam or at the mill, and that the other clauses in the deed, were not spoken of, and the amount claimed by Brown was not named. Brown testifies that this clause in the deed was spoken of by appellant, and whether the six hundred inches should be taken from the dam or mill. He states he has no recollection of ever informing appellant, at any time, of the amount of water he claimed under the deed. Then if Smith's first deposition were correct, it is the only evidence of notice to the appellant, and would be insufficient to overcome the sworn answer.

Nor was the parol evidence admissible to explain, vary, or contradict the deed. It must speak the intention of the parties. If there is an ambiguity, it is apparent upon its face, and is not capable of explanation by extrinsic evidence. While a *latent* ambiguity may be so explained, it is because it is made to appear by evidence outside of the instrument, yet a patent ambiguity is not susceptible of any other explanation than that furnished by the instrument itself.

The decree of the court below must be reversed and the cause remanded.

*Decree reversed.*